

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-11-00039-CR

_____


ERIK HEIGELMANN, Appellant

V.

THE STATE OF TEXAS, Appellee



On Appeal from the 5th Judicial District Court
Bowie County, Texas
Trial Court No. 10F0087-005



Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

Erik Heigelmann was tried before a jury for the first-degree felony of aggravated robbery of Heather Garner and received a sentence of twenty years' imprisonment. During the trial, the State introduced evidence of four other robberies. In his appeal, Heigelmann raises two points of error, complaining first of the introduction into evidence of the extraneous offenses and second, complaining of error regarding a note given to the jury by the trial court in responding to a question pertaining to the application of the evidence of those extraneous offenses. We find that there was no error in the admission of the extraneous offenses, but that error occurred in the content of the note sent by the trial court to the jury.

## I.     Background

On November 6, 2009, Garner was working at Holiday Cleaners when she noticed a man acting suspiciously as he repeatedly drove a silver four-door Ford through the parking lot. The man came into the cleaners and asked if it was a barber shop, and Garner replied that it was not. Although the man left the building, Garner did not see him drive away,[1] something that Garner believed was "weird." Approximately five or ten minutes later, a man wearing a red toboggan cap, a gray shirt, and white socks with red lines on his hands entered the cleaners. The man

---

[1]Next door at the Cameo Beauty Salon, Kim Pomes and Tish Hicks were working when a "young man" with salt-and-pepper hair and a goatee came in and made an appointment for a haircut. About fifteen minutes later, the young man returned to the salon to change his appointment time for the following day. This individual made Pomes nervous because he seemed to be "a little off." Hicks followed the man outside and noticed he was driving a silver or grayish four-door Ford Taurus. At trial, both Hicks and Pomes identified Heigelmann as the man who entered the salon on November 6, 2009.

2

covered his face with something, pointed a silver-black gun at Garner's head, and demanded cash.

Garner complied with the demand, handing over money from the cash register. The robber then

fled, and Garner called 9-1-1 to report the robbery.[2] At trial, Garner testified that although

Heigelmann looked like the robber, she could not be 100 percent sure that he was the one who had

robbed her that day due to the face covering the robber had employed.

The State maintained that defense counsel placed identity in issue in his opening statement

of the trial by telling the panel, "We only want the right person brought to justice and the right

person punished."[3] Upon conclusion of opening statements, the trial court conducted a hearing

outside the presence of the jury regarding the admission of the extraneous offense evidence. At

the hearing, the State claimed that in five robberies occurring in October and November 2009,

Heigelmann was positively identified as the assailant. The trial court summarized the offense

reports:[4]

> [T]here was a robbery October 1 at the Super 8 Motel, the suspect ran in . . . and took the money. There's no allegation that he had a gun, at least in the offense reports. On October 12 it's alleged that the perpetrator ran in covered by a scarf, white socks, pointed a gun at the clerk covered by a scarf or white socks, ordered her to a room, faced the wall. On October 28 the clerk alleges that the person came up behind the victim, demanded the money, grabbed it from the drawer, suspect had on a blue bandanna around the face and head, socks over both hands, small

---

[2]Later, Garner was unable to identify the robber from a photographic line-up. At trial, Garner was not able to definitively identify Heigelmann as the robber. She did, however, identify Heigelmann as the man who initially entered the cleaners, asking if it was a barber shop.

[3]Counsel for the State contended that this statement placed identity in issue, which therefore opened the door to extraneous offense evidence.

[4]Heigelmann has not been convicted of any of the extraneous offenses in issue.

3

caliber handgun in a sock in the left hand. November 4, the clerk alleges that a perpetrator wearing a full face Halloween skeleton mask with white socks over both hands, there wasn't any reference to a gun. And November 6 is the present case. The allegation is defendant came in with a red bandanna and a pistol, and on November 8 at the Dollar General, there's an allegation that a perpetrator came in a red bandanna with a towel wrapped around the face and socks on both hands.

The trial court concluded the October 12, October 28, November 4, and November 8 extraneous offenses were sufficiently similar to the November 6 offense to be admissible under Rule 404(b) to prove identity. TEX. R. EVID. 404(b).

When the jury was called in, the trial court read a limiting instruction indicating they would hear evidence that Heigelmann committed offenses other than the offense charged in the case before them. The trial court instructed the jury:

> [Y]ou're about to hear evidence that the defendant committed offenses other than the offense charged in this case. You are instructed that this evidence is being admitted to prove, if it does, the identity of the defendant as the person who is alleged to have committed the offense charged in this case, and for no other reason. You are instructed that you may not consider this evidence unless you first find beyond a reasonable doubt that the defendant committed the extraneous offenses, and if you make that finding, then you may only consider the evidence for the purpose of establishing the identity of the defendant as the person who is alleged to have committed the offense charged in this case.

Basically the same instruction was repeated in the written jury charge.

The State called six witnesses to prove the extraneous offenses. After having been charged and during the course of its deliberation, the jury submitted a question to the trial court asking, "Whether or not I can use the evidence in the other cases to decide the innocence or guilt of this person in this case." The trial court indicated that its proposed response was to be, "You may

4

use the evidence from any of the other robbery cases that you find beyond a reasonable doubt were committed by the defendant to decide the innocence or guilt of the defendant in this case." Defense counsel objected to the proposed response:

> It's our position that we need a specific limiting instruction, that we need to instruct the jury that that information may only be used if it establishes the defendant's identity. My concern is with the instruction the way it's drafted has a tendency to make the -- it could have a tendency to make the jury think, if we find that he did these other ones, we necessarily find that he did this one too. . . . [T]he purpose of the limiting instruction is so that that evidence is not used to establish the defendant's character, but only to establish his identity. . . .
>
> . . . .
>
> I'm asking for a re-statement of the instruction as it was originally written.

The trial court overruled Heigelmann's objection and submitted the response as quoted above. Heigelmann was thereafter convicted of the aggravated robbery[5] of Garner as charged and sentenced to twenty years' imprisonment.

## II.    Analysis

### A.    The Extraneous Offenses

The admission of extraneous offense evidence is reviewed under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court properly admits the evidence in light of the factors enunciated in *Montgomery v. State*, 810 S.W.2d 372 (Tex. Crim. App. 1990), and the court's decision to admit the evidence is within the zone of reasonable disagreement, the trial court's decision will be upheld. *Moses*, 105 S.W.3d at 627.

---

[5]TEX. PENAL CODE ANN. § 29.02 (West 2011).

The question of evidentiary admissibility rests on the bedrock notion of relevancy. Evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401. "All relevant evidence is admissible, except as otherwise provided by . . . these rules. . . . Evidence which is not relevant is inadmissible." TEX. R. EVID. 402. Rule 404 provides: "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). Evidence of "other crimes, wrongs or acts" may be admissible if it has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b).

"Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Daggett v. State*, 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (citing TEX. R. EVID. 404(b)). Here, it is claimed that the extraneous offense evidence is admissible for the purpose of showing identity. "An extraneous offense may be admissible to show identity only when identity is at issue in the case." *Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).

To be admissible, evidence of other acts must (1) be relevant to a fact of consequence in the case aside from its tendency to show action in conformity with character, and (2) the probative

6

value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *Id.* *see* TEX. R. EVID. 401, 402, 403, 404(b); *see also Montgomery*, 810 S.W.2d at 389–90 (op. on reh'g) (describing factors to consider when balancing under Rule 403).

The extraneous offense evidence of three previous robberies and one subsequent robbery was presented to the jury for the purpose of proving the identity of the robber in this case.

### 1. The Rehkopf Gas Station Robbery

The first such extraneous crime involved the October 12 robbery of Rehkopf's grocery and gasoline station in Texarkana. On that date, Lisa Williams was working as an attendant at the gas station box of Rehkopf's grocery. Moments prior to the robbery, Williams, in preparing to change the paper on the pumps, unlocked the gas station box door (a door which normally remained locked). When Williams turned around to retrieve the pump key, the door flew open and a man wearing a ski mask and a bandanna, a hunting jacket, and black gloves appeared. His entire body was covered, with the exception of his eyes. The assailant carried a black, squared off gun, and indicated that if Williams looked at him, he would kill her. With his gun trained on Williams, the assailant threatened her life. After taking the money, the assailant instructed Williams not to look at him or "call the laws [sic]." He then left only to reappear a minute later—ostensibly to determine if Williams called the police.

7

Williams saw the assailant's eyes and "bushy eyebrows." She identified the assailant as the man pictured in State's Exhibit 1 and, at trial, identified Heigelmann as her assailant.[6]

### 2. The First Dixie Mart Robbery

On the evening of October 28, Donna Schanfish was working as a Dixie Mart clerk just outside the city limits of Genoa, Arkansas. As was typical, Schanfish was working alone. Around 7:00 p.m., a man came into the store and asked for a water jug on his representation that his car was overheating. Schanfish directed him to a water hose located behind the store. The man then re-entered the store and asked if he could get five dollars worth of gas until he could return home and retrieve his wallet. Schanfish charged the gasoline to her account, and the man left.

Approximately five minutes later, when Schanfish emerged from the store's kitchen, a man came running around the counter toward her yelling, "Give me the money, give me the money." He had socks on his hands and a bandanna covered his face, except for his eyes. The assailant appeared to be holding a gun, hidden by the socks worn on his hands. After taking the money from the cash register, the man ran from the store.

Schanfish identified her assailant as the man pictured in State's Exhibit 1, and at trial, identified Heigelmann as her assailant.

Heigelmann concedes the characteristics of this offense are similar to the robbery of Garner at Holiday Cleaners.

---

[6]State's Exhibit 1 is a photograph of Heigelmann.

### 3. The Second Dixie Mart Robbery

On the evening of November 4, Teresa Belk was working as a clerk at Dixie Mart[7] training a new employee. At approximately 7:15 p.m., a man came running in the front door yelling, "Give me the money." The man wore a Halloween mask with a hood over it and socks on his hands. He fled on foot after he was given the money.

During the course of her testimony, Belk did not indicate that the man was carrying a gun at the time of the robbery. Even though Belk could only see the area surrounding the man's eyes, she noticed that his eyebrows were bushy.

Belk testified the man pictured in State's Exhibit 1 "looks like" her assailant. At trial, Belk identified Heigelmann as her assailant.

---

[7]The record does not indicate whether the second Dixie Mart robbery involved the same Dixie Mart robbed on October 28.

### 4.      The Dollar General Robbery

The Dollar General store, located on New Boston Road in Texarkana, was robbed on November 8, 2009—only two days after the robbery of Garner at Holiday Cleaners.   Witnesses described the assailant as a slender, white male wearing a flannel shirt, a red cap, and white socks on his hands.   Investigating officers were advised by radio that the suspect's description was similar to a suspect in a cross town robbery and that he might be driving a 1990s model silver-gray Ford Taurus.

Just such a vehicle was discovered in the driveway of a residence approximately a block from the Dollar General.   The suspect in that robbery (who turned out to be Heigelmann) was located inside the residence where the silver-gray Ford Taurus was parked.   The owner of the residence told officers that certain clothes in the residence belonged to Heigelmann, including a red bandanna, a pair of white socks, a gray T-shirt, and a burgundy flannel shirt.   The video recording of the robbery revealed the confiscated clothing matched the suspect's clothing worn in the robbery.   Heigelmann admitted to owning the burgundy flannel shirt.

A search of the Taurus uncovered a camouflage jacket, several pairs of white socks, a pair of Skecher shoes, hypodermic needles, a Bible with the name Erik Heigelmann written on it, and a cell phone.   Upon obtaining a search warrant for the cell phone, officers discovered a text to the homeowner in whose driveway the Taurus was located which stated, "Found the perfect hit. Clothes at your house.   When will you be home."   (A "hit" is a street term for robbery.)

10

## B. Similarity of Offenses

Heigelmann maintains that the Rehkopf robbery, the second Dixie Mart robbery, and the Dollar General robbery[8] were sufficiently dissimilar to the robbery at Holiday Cleaners to have excluded evidence of them being admitted.[9]

When seeking to introduce extraneous offense evidence to prove identity of the assailant in another case, the extraneous offense "must be so similar to the charged offense that the offenses illustrate the defendant's 'distinctive and idiosyncratic manner of committing criminal acts.'" *Jackson v. State*, 320 S.W.3d 873, 883–84 (Tex. App.—Texarkana 2010, pet. ref'd) (quoting *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005)). As this Court recognized in *Jackson*, the framework for analyzing the similarity of extraneous offenses requires that

> [t]he common characteristics of each offense must be so unusual as to act as the defendant's "signature." *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996). "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as

---

[8]According to Heigelmann, the characteristics of the first Dixie Mart robbery "are similar to the Holiday Cleaners robbery."

[9]Heigelmann further claims the trial court erred in ruling on the admissibility of the extraneous offense evidence prior to the introduction of any evidence. Moreover, Heigelmann alleges that it was error for the trial court to advise the jury it was about to hear that Heigelmann committed other crimes before the jury heard any evidence of any crime.

At trial, Heigelmann did not object to the trial court's procedure of ruling on the admissibility of the extraneous offense evidence prior to the introduction of evidence. Likewise, Heigelmann did not object to reading the limiting instruction prior to the introduction of evidence. The trial court was clear in reading the limiting instruction to counsel before it was presented to the jury. No objection was made to the content of the instruction. To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. TEX. R. APP. P. 33.1(a)(1)(A); *Rhoades v. State*, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996). A reviewing court will not consider errors not called to the trial court's attention. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Because Heigelmann failed to raise these complaints at trial, we may not address them for the first time on appeal.

11

having been committed by the same person." *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008). "Usually, it is the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or *modus operandi* of a single individual." *Id.* In the context of evaluating the admissibility of extraneous offenses, *modus operandi* refers to "a defendant's distinctive and idiosyncratic manner of committing criminal acts." *Owens*, 827 S.W.2d at 914.

*Jackson*, 320 S.W.3d at 884.

In each of the extraneous robberies, in addition to the robbery in this case, the assailant wore a head covering, either a bandanna or a mask or both, and wore coverings over his hands—most commonly described as socks. While the instant crime, along with the Rehkopf gas station robbery and the first Dixie Mart robbery involved the display of a gun, there was no mention of a gun in either the second Dixie Mart robbery or the Dollar General robbery. Each of the robberies involved an assailant who acted alone and whose face was completely covered, with the exception of his eyes.[10]

In each of the robberies, the assailant quickly demanded money and immediately fled the scene. The victims in each of the robberies were working alone (with the exception of the second Dixie Mart robbery, when a new employee was being trained).[11] Each of the robberies took place in the Texarkana area—including Texarkana, Texas (Dollar General); Texarkana, Arkansas

---

[10]Two of the witnesses described the assailant as having "bushy eyebrows."

[11]The record does not indicate whether there was more than one employee at the Dollar General store at the time it was robbed.

(Rehkopf gas station); Wake Village, Texas[12] (Holiday Cleaners); and Genoa, Arkansas (Dixie Mart). Further, each of the five robberies occurred within thirty days of one another.

Heigelmann relies on the dissimilarities in the robberies to argue for exclusion. For example, the assailant in the Rehkopf robbery was wearing black gloves rather than socks on his hands, there was a verbal threat to kill the victim, and the assailant actually returned to make sure the victim did not call the police. In addition, there was neither testimony regarding how many people were in the Dollar General store at the time of the robbery, nor did anyone testify what, if anything, the assailant wore over his face.[13] As described, each of these crimes involves small, sometimes individually insignificant details that mark each as the handiwork or *modus operandi* of a single individual. *See Owens v. State*, 827 S.W.2d 911, 914 (Tex. Crim. App. 1992). The test for admissibility does not require that each crime take place under identical circumstances or *modus operandi*.

In *Hartsfield*, this Court held an extraneous offense was admissible to prove identity when the offenses occurred in the same geographic area, were committed three days apart and at night, were committed with accomplices, and the perpetrators first emptied the cash register and then

---

[12]The Court takes judicial notice of the location of Wake Village, Texas, as approximately 3.9 miles west of Texarkana, Texas, and that Genoa, Arkansas, is situated less than ten miles east of Texarkana, Texas. We may take judicial notice of facts which are notorious, well known, or easily ascertainable. *Eagle Trucking Co. v. Tex. Bitulithic Co*., 612 S.W.2d 503, 506 (Tex. 1981); *see Ex parte Britton*, 382 S.W.2d 264, 265 (Tex. Crim. App. 1964); *Bell v. State*, 63 S.W.3d 529, 532 n.3 (Tex. App.—Texarkana 2001, pet. ref'd). This includes distances between two geographic locations. *Bell*, 63 S.W.3d at 532 n.3.

[13]The trial court indicated that with respect to the Dollar General robbery, "[T]here's an allegation that a perpetrator came in a red bandanna with a towel wrapped around the face and socks on both hands." However, there was no testimony to this effect.

rifled through the shelves beneath the cash register at both locations. *Hartsfield v. State*, 305 S.W.3d 859, 872 (Tex. App.—Texarkana 2010, pet. ref'd).

Here, the offenses occurred in the same geographic area within a relatively brief time frame; all were committed by an assailant who covered his hands with socks or gloves, and whose face was completely covered by a similar covering, leaving only the eyes exposed. In all robberies, the assailant acted alone. There are sufficient common characteristics between each of these robberies, including geographic location, proximity in time, and mode of dress. For these reasons, we hold the extraneous offenses are relevant to prove identity.

### C.      The Danger of Unfair Prejudice

Further, for this evidence to be admissible, its probative value must not be substantially outweighed by the danger of unfair prejudice. *Id.* at 873. In making this determination, we consider (1) how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable, (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way, (3) the trial time needed to develop the evidence, and (4) the proponent's need for the extraneous offense evidence. *Montgomery*, 810 S.W.2d at 389–90; *Hartsfield*, 305 S.W.3d at 873.

The issue of identity was initially presented in the opening statement. Throughout the trial, the identity issue was at play. During closing argument, defense counsel emphasized testimony regarding the identity of the individual who robbed Garner. The victim in that robbery

was quoted as stating that she wanted the right man punished, and if Heigelmann did not commit the robbery, she did not want him punished. The previous robberies were committed twenty-five, nine, and two days prior to the instant robbery. The subsequent robbery was committed just two days after the instant robbery. As previously described, the extraneous robberies were similar to this one. The evidence is thus probative on the issue of identity, a fact of great consequence.

While all evidence of extraneous crimes is almost always inherently prejudicial and carries the potential to impress the jury of a defendant's character conformity, this potential is minimized through a limiting instruction. Evidence of the extraneous robberies was evaluated by the trial court and was accompanied by an instruction of its limitations before it came before the jury. A jury could rationally evaluate the evidence on the issue of identity in accordance with the trial court's instruction.[14]

As for the amount of trial time needed to develop the evidence, the extraneous offense evidence was not overwhelming. The entire trial lasted three and one-half days. During that time, the State called six witnesses to prove the extraneous offenses. However, the testimony of each such witness was relatively brief, and all were called on the same day as the witnesses to the Holiday Cleaners' robbery. The indicted offense was the first offense the jury heard about, and witnesses to this offense were initially called at trial. This took approximately one-half day,

---

[14]Heigelmann contends the trial court's limiting instruction caused the introduction of the extraneous offense evidence to result in unfair prejudice because the instruction effectively told the jury that he was a criminal in general and, therefore, probably committed the charged offense. As previously discussed, any error with respect to the content or timing of the limiting instruction was not preserved, and thus may not be considered for the first time on appeal.

while proof of the four extraneous offenses took approximately one-half day. We do not believe this amount of time was excessive.

In evaluating the proponent's need for the extraneous evidence, we acknowledge that although Garner, the victim in the robbery, could not positively identify Heigelmann as the perpetrator of the crime, the identity of Heigelmann as the robber was supported by some evidence. He had been on the premises only minutes prior to the robbery and two witnesses (who were working at the Cameo Beauty Salon next door to the cleaners where the robbery occurred) testified about their encounter with Heigelmann the same afternoon as the robbery. Those witnesses testified that Heigelmann was present in the immediate area and acting a "little off" just minutes before the robbery. Even so, there was no direct evidence Heigelmann was the assailant in the robbery at Holiday Cleaners. Extraneous offense evidence was therefore needed in order to identify Heigelmann as the assailant in the Holiday Cleaners' robbery.

Because the trial court's decision to admit the extraneous offense evidence was within the zone of reasonable disagreement, there was no abuse of discretion in the admission of this evidence. *See Moses*, 105 S.W.3d at 627.

16

### D.     Error in Clarification of Jury Instruction

Next, Heigelmann complains that when the jury sent out a note during its deliberations, the trial court erred in its response by instructing the jury that it could use evidence of extraneous offenses to determine Heigelmann's guilt or innocence.

The jury may communicate with the trial court if a question arises during deliberations and the trial court must respond to the jury's question in writing.   TEX. CODE CRIM. PROC. ANN. art. 36.27 (West 2006).   When the trial court submits a substantive response to a jury question during deliberations, such communication is viewed as an additional or supplemental jury instruction.[15] *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993); *Barrera v. State*, 10 S.W.3d 743, 747 (Tex. App.—Corpus Christi 2000, no pet.).   Therefore, if an instruction may properly be given in the original charge, it may also be given as an additional instruction.  *Daniell*, 848 S.W.2d at 147; *Barrera*, 10 S.W.3d at 747.

The trial court's written charge on use of the extraneous offenses stated:

> During the course of this trial, you heard evidence that the Defendant committed extraneous offenses other than the offense charged in this case.  You are instructed that this evidence was admitted to prove, if it did, the identity of the Defendant as the person who is alleged to have committed the offense charged in this case, and for no other reason.  You are instructed that you may not consider evidence of other offenses alleged to have been committed by Defendant unless you first find beyond a reasonable doubt that the Defendant committed the extraneous offenses; and if you make that finding, then you may only consider the

---

[15]*But see Earnhart v. State*, 582 S.W.2d 444, 450 (Tex. Crim. App. [Panel Op.] 1979) (holding communication from court that merely refers jury to original charge not "additional instruction").

evidence for the purpose of establishing the identity of the Defendant as the person who is alleged to have committed the offense charged in this case.[16]

While deliberating, the jury sent a note to the trial court asking the court to "clarify jury instruction on page 5 Para A" (in reference to the above-quoted instruction). The written response of the trial court was, "Please clarify your question: what is it that you want to know about the instruction on page 5?" The written response of the jury foreperson was, "whether or not I can use the evidence in the other cases to decide the innocence or guilt of this person in this case."

Over Heigelmann's objection, the trial court responded to the jury in writing: "You may use the evidence from any of the other robbery cases that you find beyond a reasonable doubt were

---

[16]This written charge mirrors, in pertinent part, the special instruction found in Section A3.1, *Texas Criminal Pattern Jury Charges*. The special instruction regarding the limited use of evidence provides:

> During the trial, you heard evidence that the defendant may have committed wrongful acts not charged in the indictment. . . . The state offered the evidence to show that the defendant [describe purpose]. You are not to consider that evidence at all unless you find, beyond a reasonable doubt, that the defendant did, in fact, commit the wrongful act. Those of you who believe the defendant did the wrongful act may consider it.
>
> Even if you do find that the defendant committed a wrongful act, you may consider this evidence only for the limited purpose I have described. You may not consider this evidence to prove that the defendant is a bad person and for this reason was likely to commit the charged offense. In other words, you should consider this evidence only for the specific, limited purpose I have described. To consider this evidence for any other purpose would be improper.

Comm. on Criminal Pattern Jury Charges, State Bar of Texas, *Texas Criminal Pattern Jury Charges: Intoxication and Controlled Substances* § A3.1 (2009).

committed by Defendant to decide the innocence or guilt of Defendant in this case."[17]  Shortly thereafter, the jury returned its verdict of guilt.

We must decide whether the clarification instruction was such that it could have properly been given in the original charge.  We conclude that it could not.

The charge of the court instructed the jury it was to consider the extraneous offense evidence solely for the purpose of "establishing the identity of the Defendant as the person who is alleged to have committed the offense charged in this case."  When the jury inquired whether it could utilize the extraneous offense evidence "to decide the innocence or guilt of this person in this case," it is apparent the jury understood the purpose of the evidence was to establish identity—thus tacitly recognizing the all-encompassing nature of the issue of "innocence or guilt."  In this light, the clarification instruction could be interpreted to mean that because Heigelmann committed other crimes, his character as a robber could be utilized to determine whether he robbed Garner at Holiday Cleaners.  Rule 404(b) expressly prohibits the introduction of extraneous offenses to

---

[17]There was a lengthy in chambers discussion regarding the appropriate response of the trial court.  Defense counsel objected to the trial court's response, maintaining that

> Identity may well go to issues of guilt or innocence, but there are other considerations that the jury could take into mind, other factors that would also go to guilt or innocence. . . .
>
> . . . .
>
> . . . . My concern is with the instruction the way it's written, to me it seems like there's a danger that the jury could say, if I find he did those other ones I necessarily must find that he did this one too, where the jury could find he did those other ones, but not this one.  All I'm asking the Court to do is to re-state the instruction as it was originally written.

19

show character conformity. Tᴇx. R. Eᴠɪᴅ. 404(b); *Page v. State*, 137 S.W.3d 75, 78 (Tex. Crim. App. 2004); *Moses*, 105 S.W.3d at 626.

The issue of guilt is quantifiably and substantively different than the issue of *identity*. Heigelmann was charged with aggravated robbery of Garner. The trial court instructed the jury,

> [I]f you find from the evidence beyond a reasonable doubt that on or about the 6th day of November, 2009, in Bowie County, Texas, the Defendant, ERIK HEIGELMANN, while in the course of committing theft of property, and with intent to obtain and maintain control of said property, threatened or placed Heather Garner in fear of imminent bodily injury or death, and the defendant did then and there use or exhibit a deadly weapon, to-wit: a firearm, then you will find the defendant guilty of aggravated robbery. Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant of aggravated robbery, and say by your verdict "Not Guilty."

This instruction sets forth every element necessary to find Heigelmann guilty of aggravated robbery. While identity is an element of the crime, it was also necessary for the jury to find Heigelmann (1) while in the course of committing theft of property, (2) with intent to obtain and maintain control of said property, (3) threatened or placed Garner in fear of imminent bodily injury or death, and (4) used or exhibited a firearm.

The extraneous offense evidence was admitted for the sole purpose of proving identity.[18] Yet, the trial court's written clarification appears to have allowed the jury to consider something entirely different: use of the extraneous offense evidence to determine Heigelmann's guilt. A determination of guilt requires the jury to find proof beyond a reasonable doubt of four elements in

---

[18]Such evidence can also be admitted, under proper circumstances, for the purpose of showing motive, opportunity, intent, preparation, plan, knowledge, or absence of mistake or accident. *Moses*, 105 S.W.3d at 626.

20

addition to identity. Moreover, the written clarification invited the jury to find Heigelmann guilty based on character conformity. It was error for the trial court to so advise the jury.

### E. Harm Analysis

Our review of the charge is under the *Almanza* standard when the failure to properly instruct the jury results in error. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). An erroneous or incomplete jury charge does not result in automatic reversal. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Instead, the appellate court "must determine whether sufficient harm resulted from the error to require reversal." *Id.* at 731–32; *Almanza*, 686 S.W.2d at 171.

The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error. *Abdnor*, 871 S.W.2d at 732. When a proper objection is made at trial, reversal is required if the error is "calculated to injure the rights of defendant"—the appellant need only demonstrate "some harm" on appeal. *Id.*; *see also Almanza*, 686 S.W.2d at 171. In the case of unpreserved error, reversal is required only when "the error is so egregious and created such harm that he 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Almanza*, 686 S.W.2d at 171; *see Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd). "Egregious harm" results from errors affecting the very basis of the case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly

21

more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991); *Boones v. State*, 170 S.W.3d 653, 660 (Tex. App.—Texarkana 2005, no pet.).

Here, Heigelmann objected to the clarifying instruction and requested the trial court to "re-statement of the instruction as it was originally written." The instruction as originally orally given to the jury and (for all practical purposes) repeated in the original charge was an accurate statement of the law. We, therefore, review the record to determine whether Heigelmann suffered "some harm." *Abdnor*, 871 S.W.2d at 732. "[A]n error which has been properly preserved by objection will call for reversal as long as the error is not harmless." *Id.* In conducting a harm analysis we may consider (1) the entire jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171.

The introduction of extraneous offense evidence is inherently prejudicial and harmful to the defendant because it requires that the defendant "defend against not only the offense charged, but also his uncharged actions." *Carter v. State*, 145 S.W.3d 702, 710 (Tex. App.—Dallas 2004, pet. ref'd). In addition, the jury is naturally inclined to infer guilt to the charged offense from the extraneous offense. *Id.*; *Russell v. State*, 146 S.W.3d 705, 715 (Tex. App.—Texarkana 2004, no pet.). Thus, when no limiting instruction is given to lessen the prejudice from the extraneous offense evidence, any prejudice resulting from introduction of such evidence is unabated. *Abdnor*, 871 S.W.2d at 738.

Here, the nature of the error is an expansion of the permissible reasons for which an extraneous offense may be considered by the jury. The State maintains that because the original charge on this issue was correct, there was no error (and, thus, no harm) in the clarification of that legally correct instruction. We disagree.

The original charge instructed the jury to consider the extraneous offense evidence only to establish identity. The clarification told the jury the extraneous offense evidence could be considered to determine guilt or innocence. As previously discussed, identity and guilt are distinct concepts. The second instruction, although intended as a note to clarify the previous instruction, was, in fact, a new and different instruction, contradicting the original statement. As such, the jury was free to disregard the initial, legally correct instruction and to consider the extraneous offense evidence to determine Heigelmann's guilt—thus allowing the jury to convict on the basis of the extraneous offense(s). In such a situation, any prejudice resulting from the introduction of such evidence is unabated. *See Abdnor*, 871 S.W.2d at 738. Such unabated prejudice is sufficient to demonstrate "some harm" under *Almanza*.

**III.     Conclusion**

Because we hold the trial court erred in instructing the jury, and because some harm ensued as a result of that error, we reverse the trial court's judgment and remand this cause to the trial court for a new trial.

Bailey C. Moseley
Justice

Date Submitted:     February 14, 2012
Date Decided:       March 2, 2012

Publish