

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-11-00249-CR
_____

RENRICK TAYLOR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 10-0264X

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

MEMORANDUM OPINION

Renrick Taylor was convicted of the murder of LeShun Rena Jenkins and sentenced to ninety-nine years' imprisonment. Taylor complains that the trial court failed to correctly charge the jury during punishment on the effects of parole. We affirm the trial court's judgment because we find that egregious harm was not demonstrated.

## I. The Trial Court's Jury Charge Was Erroneous

Our review of error in this jury charge involves a two-step process. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009). Initially, we determine whether error occurred, and then evaluate whether sufficient harm resulted from the error to require reversal. *Abdnor*, 871 S.W.2d at 731–32.

A trial court must submit a charge setting forth the "law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application to the case." *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). "It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.*

Section 4(a) of Article 37.07 contains the language of a mandatory charge[1] that a trial judge must submit to the jury if it is assessing punishment in the penalty phase of a murder case. TEX. CODE CRIM. PROC. ANN. arts. 37.07, §§ 4(a), 42.12, 3g(a)(1) (West Supp. 2011). The trial court's charge to the jury differed from the mandatory charge in three respects.

Whereas the first sentence of the mandatory charge reads: "[u]nder the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the *period of incarceration* imposed through the award of good conduct time," the trial court's charge read "[u]nder the law applicable in this case, the defendant, if sentenced to a term of imprisonment,

---

[1] The entire language of the mandatory charge is:

> Under the law applicable in this case, the defendant, if sentenced to a term of imprisonment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

> It is also possible that the length of time for which the defendant will be imprisoned might be reduced by the award of parole.

> Under the law applicable in this case, if the defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted.

> It cannot accurately be predicted how the parole law and good conduct time might be applied to this defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

> You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular defendant. You are not to consider the manner in which the parole law may be applied to this particular defendant.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a).

3

may earn time off the *sentence* imposed through the award of good conduct time." TEX. CODE CRIM. PROC. ANN. art. 37.07, § 4(a) (emphasis added). Second, whereas the third paragraph of the mandatory charge reads, "If the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole. Eligibility for parole does not guarantee that parole will be granted," the trial court omitted this language from the charge. *Id.* Third, after including the mandatory sentence stating, "You are not to consider the manner in which the parole law may be applied to this particular defendant," the trial court added, "Such matters come within the exclusive jurisdiction of the Pardon and Parole Division of the Texas Department of Criminal Justice and the Governor of Texas."

The trial court's charge is inaccurate because it fails to correctly state the mandatory language of Article 37.03. *See Hill v. State*, 30 S.W.3d 505, 507 (Tex. App.—Texarkana 2000, no pet.). "A trial court commits error when it deviates from the statutorily mandated language by adding or deleting language." *Loun v. State*, 273 S.W.3d 406, 415 (Tex. App.—Texarkana 2008, no pet.). The State concedes error, stating "[t]he trial court's charge did contain variations and an omission from the statutory language of Art. 37.07, Texas Code of Criminal Procedure so the State will not argue there was no error."

## II.     Egregious Harm Was Not Demonstrated

A finding of error triggers the evaluation of harm under the *Almanza* standard. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g). The question of whether the appellant properly objected to the error at trial determines the level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction on appeal. *Abdnor*, 871

4

S.W.2d at 732. Where, as here, no objection was made to the jury charge at trial, reversal is required only when "the error is so egregious and created such harm that the appellant 'has not had a fair and impartial trial'—in short 'egregious harm.'" *Heigelmann v. State*, 362 S.W.3d 763, 776 (Tex. App.—Texarkana 2012, no pet.) (citing *Almanza*, 686 S.W.2d at 171); *see Rudd v. State*, 921 S.W.2d 370, 373 (Tex. App.—Texarkana 1996, pet. ref'd).

"'Egregious harm' results from errors affecting the very basis of the case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or makes the case for conviction or punishment clearly and significantly more persuasive." *Id.* (citing *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991); *Boones v. State*, 170 S.W.3d 653, 660 (Tex. App.—Texarkana 2005, no pet.)). Egregious harm is a difficult standard to meet and must be determined on a case-by-case basis. *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). We consider the charge itself, the state of the evidence (including contested issues and the weight of the probative evidence), arguments of counsel, and the record as a whole in addressing harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996); *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd).

In looking at the charge, we find substitution of the phrase "sentence imposed" for the mandatory language of "period of incarceration imposed" to be of little consequence, and thus, harmless. The trial court's omission of "[i]f the defendant is sentenced to a term of less than four years, he must serve at least two years before he is eligible for parole" is likewise harmless because Taylor's minimum possible sentence was five years' imprisonment. Indeed, the trial court correctly omitted that sentence since it was inapplicable in this case.

5

However, the trial court's omission of the language "[e]ligibility for parole does not guarantee that parole will be granted," is an omission capable of serious consequence. Following the State's explanation that "after serving at least one-half of his time or 30 years, whichever is less, [Taylor] would be eligible for parole," the impact of the omission, if any, was mitigated to a degree by the defense attorney's explanation to the jury in this excerpt:

> In here, [the State] pointed out about the half of the sentence or the 30 years. There's one key word where it says "eligible."

> It's not automatic. Someone doesn't automatically make parole. It has to be earned. You have to show that you're worthy of it before you're given parole.

Defense counsel's statement does not go so far as to admonish that there is no guarantee that parole will be granted. Thus, we now consider the state of the evidence.

This murder investigation began when the partially decomposed body of a female was found at a well site. An autopsy report recorded several rib fractures and concluded that the victim died of homicidal violence. Partial fingerprint analysis identified Jenkins as the victim of the crime.

Officer Martin Latham obtained consent to search alleged co-conspirator Jamel Cooper's home based upon "information we had received . . . that LaShun Jenkins' clothes were burned in a burn barrel behind [Cooper's] house." "[B]loody clothes" were found in the barrel, and Cooper was taken into custody for questioning. He told Latham that Jenkins "had been run over by a vehicle." Taylor was interrogated by Latham, as suspicion was placed upon him after Cooper's account of the incident was recorded.

6

In a recorded confession, an initially smiling Taylor recalled that he was riding around in his car with Cooper "looking for some fun." Taylor admitted to procuring Jenkins for the purpose of engaging in oral sex, and the two drove to the local park to commence the transaction. According to Taylor, Cooper decided that Jenkins' performance was not worth the twenty dollars originally agreed upon and withheld full payment, prompting an altercation. Taylor admitted that he "threw two punches" at Jenkins and that by the end of the mêlée, Jenkins was bleeding profusely.

The record indicates that Taylor was able to fully appreciate the severity of the beating dealt to the unconscious victim, noting in his interview that he and Cooper contemplated taking Jenkins to the hospital, but failed to do so out of fear of being arrested for "attempted murder." Rather than taking Jenkins to the hospital, Taylor restrained her with electrical tape and placed her battered body in the trunk of his car. Taylor and Cooper "drove around," canvassing the area for a proper location to dispose of Jenkins. The two arrived at a local construction site, threw Jenkins onto the ground, and "stomp[ed] her" several times. Taylor then grabbed Jenkins and threw her into a "reserve pit that was full of water" while she was still alive. Taylor admitted that "we kicked her and dumped her . . . we did everything."[2]

Lieutenant David Lewis was asked to search Taylor's vehicle. "BLUESTAR reaction to latent blood" indicated the presence of blood on Taylor's tires, hubcap, and undercarriage,

---

[2]Taylor, who had initially denied involvement during his recorded interview, again denied involvement six months later. Cindy Dowler testified that Taylor told another story that "he and Jamel Cooper had been to the park and paid Jenkins for sex and went back and beat her up." Taylor and Cooper then went to Dijuan Sessions' home, where Charles Flamer was present. Taylor claimed that all four "went back to the park and got Jenkins and put her in the trunk . . . after Flamer told them to do this." According to Dowler, Taylor now claimed Flamer was the one who drove Taylor's car and ran over Jenkins.

substantiating Cooper's statement that Jenkins had been run over by Taylor's vehicle. Lewis testified that he found "a Q-tip . . . stained with a dark-colored substance" and several "reddish-brown" stains having "the appearance of blood" in Taylor's trunk and on a chain located in the trunk. Melissa Haas, a DNA Section Supervisor with the Texas Department of Public Safety testified that swabs from Taylor's trunk, vehicle tires, the Q-tip, and the T-shirt from the burn barrel were all consistent or partially consistent with the same "unknown female individual." Forensic DNA analyst Huma Nasir testified that the DNA of the "unknown female individual" identified in Haas' testing was from a person who could not be excluded as the mother of the victim's daughter, whose DNA was previously collected for comparative analysis. The evidence led the jury to conclude that Taylor killed Jenkins in a heinous manner over her failure to return a twenty-dollar payment that was given in exchange for oral sex.

As in *Villarreal*, "we note the severity" of Taylor's conduct for which he was found guilty beyond a reasonable doubt "as a consideration supporting the jury's assessment of the maximum sentence." 205 S.W.3d at 107. Thus, even though the jury assessed a ninety-nine-year sentence, we conclude that Taylor did not meet his burden to show actual, rather than theoretical, harm as required by *Almanza*, given the state of the evidence in this case. 686 S.W.2d at 174.

Further, nothing in the record suggests that the jury had any question concerning parole law, and there is no active showing of any effect of the charge on the jury's deliberation or its assessment of punishment. The jury was instructed, "You are not to consider the manner in

8

which the parole law may be applied to this particular Defendant," and we presume that the jury followed this instruction. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

Last, after the mandatory instruction that the jury was not to consider how the parole law might be applied in this case, the trial court added, "Such matters come within the exclusive jurisdiction of the Pardon and Parole Division of the Texas Department of Criminal Justice and the Governor of Texas." This instruction is taken from the jury instructions that were given in former days when the mention of the parole law was forbidden, and the jury was instructed not to consider the length of time the defendant might actually serve. *See Underwood v. State*, 927 S.W.2d 661, 662 (Tex. App.—Texarkana 1996, no pet.). Even though that instruction is not mandated by statute, it merely emphasizes that it is not the jury's duty to attempt to calculate how the parole law would actually be imposed. The instruction is very similar to a proper instruction given to the jury that the "application of these laws will depend on decisions made by prison and parole authorities." Based upon the "ample evidence to support the jury's assessment," and state of the jury argument, we conclude egregious harm is not shown.

Taylor's sole point of error is overruled.

## III.    Conclusion

We affirm the trial court's judgment.


Jack Carter
Justice

Date Submitted:     June 11, 2012
Date Decided:        June 19, 2012

Do Not Publish