

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00174-CR

DEMARKEITHON TERRELLIOUS ROSS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 188th District Court
Gregg County, Texas
Trial Court No. 47070-A

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

During the Gregg County jury trial of Demarkeithon Terrellious Ross on a charge of aggravated robbery of a Little Caesars pizzeria, with a deadly weapon, the State tendered, and the trial court admitted over Ross' objection, evidence of an earlier robbery at the next-door Wingstop restaurant. Ross appeals from his resulting conviction, sentence of ninety-nine years' imprisonment, and order to pay $6,893.50 in fees for his court-appointed counsel.

On appeal, Ross argues that admitting evidence of the Wingstop robbery was reversible error and that he should not have been ordered to pay attorney fees. Because (1) admitting the Wingstop evidence was within the trial court's discretion, but (2) assessing attorney fees was error, we modify the judgment by deleting the order to pay attorney fees and affirm the trial court's judgment, as so modified.

*(1)*      *Admitting the Wingstop Evidence Was Within the Trial Court's Discretion*

Little Caesars employee, Equilla Mobley, testified that the robbery of his store occurred July 13, 2017, as he was preparing for closing with his manager, Deondre Thompson. Mobley said that two men entered the store as Thompson counted money from the cash registers. The first man held Thompson at gunpoint and was described by Mobley as a slender African-American, a little over six-feet tall, wearing long pants, a long-sleeved shirt, a facemask, and baseball batting gloves. The second man, a heavyset, "light skin[ned,]" African-American male, between 5'9" and 5'11," wearing a "full-face tactical mask," baseball batting gloves, a long-sleeved jacket, and shorts, approached Mobley and told him to get down on the ground. Mobley testified that the

2

second man kept him in the back room, patted him down, hid his cell phone on a high shelf, and threatened him with a pizza cutter.

According to Mobley, the man guarding Thompson turned off the lights to the building and directed Thompson to open the safe after cleaning out the cash registers. After stealing the money, the robbers brought Thompson to the back of the store and took his cell phone. The robbers then made a phone call, spoke to someone who seemed to be directing their criminal act, and walked out of the back door with two bags of cash. Mobley testified that he and Thompson did not call the police.[1]

Kiasa Ware, the general manager of Little Caesars, testified that she called the Longview Police Department (LPD) when she was notified by a shift manager that the store had been robbed of approximately $1,200.00. Ware testified that she suspected Shaterica Johnson's involvement in the crime because Johnson threatened Ware after she was fired from Little Caesars. According to Ware, Johnson had been a store manager for two years and knew the store operations and location. Ware also said that Johnson found work at the Wingstop next door, which had been robbed two months before Little Caesars.

Rachel Fox, a Longview police officer, testified that the Wingstop robbery was carried out in a similar manner by two men. In both robberies, the men entered the stores just before closing, locked the front door behind them, turned off the lights to the building, took the employees to the safe at gunpoint, and left by the back door after confiscating employee cell phones. In a manner

---

[1]According to Mobley, Thompson said, "I already pretty much got a feeling of who it was because they can only go so many places in this neighborhood."

similar to Mobley's description of events, Fox also testified that one of the men assumed an "authoritative" role and told the manager what to do during both robberies. Believing that the cases were related, Fox contacted Armando Juarezortega, a Longview police detective that was already investigating the Wingstop robbery.

Juarezortega testified that video surveillance from the Wingstop robbery involved the same two suspects as the ones depicted in the video surveillance of the Little Caesars robbery. He also testified that the patterns in the two robberies were similar. The jury compared a still photograph retrieved from the video surveillance of the Wingstop robbery to the Little Caesars video surveillance, which demonstrated that the pair of suspects in the two robberies had the same builds and wore hoodies, facemasks, and gloves. The comparison also showed that, in both robberies, the heavyset suspect wore black shorts and used the same facemask and that the slender suspect wore long pants.

According to Juarezortega, earlier surveillance of footage from the time of the Wingstop robbery revealed that a two-door, light grey 1995 Buick, identified as the vehicle used by the suspects, was registered to the defendant's sister, Damarkevia Ross. Juarezortega testified that Wingstop also had another surveillance video (the Wingstop video)[2] taken at the time of the Little Caesars robbery, which depicted the same 1995 Buick parked in the Wingstop parking lot. According to Juarezortega, Ross was already a suspect in the Wingstop robbery before July 13, but the Wingstop video contained information leading him to believe Ross was also involved in the Little Caesars robbery.

---

[2]Only one Wingstop video was admitted into evidence, the one taken at the time of the Little Caesars robbery.

The Wingstop video also showed two men with the robbers' physical builds enter the store to speak with Johnson before the Little Caesars robbery. The faces of the men were clearly visible, which allowed Longview police to identify them as Ross and Johnson's half-brother, Quadaverine Allison, who was dating Damarkevia. Juarezortega testified, and the jury saw, that Ross, who was heavyset, was wearing black basketball shorts with the lettering A1 on the sides, a white "wife beater" shirt, and dark-colored slippers. Allison wore a white t-shirt, long black pants, and black shoes.

According to Juarezortega, the Little Caesars video showed that the heavyset robber wore the same shorts worn by Ross on the Wingstop video and a white shirt under his hoodie, but had different shoes. The Wingstop robbery showed, and Juarezortega testified, that Ross had a specific gait also exhibited by the heavyset man on the Little Caesars video. The slippers Ross was wearing while at Wingstop were located in Johnson's car on the day after the Little Caesars robbery. As for the slender robber, the Little Caesars video showed that he wore the same pants and shoes as Allison on the Wingstop video and had a white t-shirt under his hoodie. Juarezortega testified that Allison was on the phone with Johnson, who was giving him instructions during the robbery.

Johnson admitted during her police interview that she told Allison over the phone how to get into the safe. Juarezortega also found text messages to Johnson from Allison before the robbery in question stating, "I'm going in today," "So how many people is [sic] it [sic] going to be at 9 some" and "about what the cameras and is [sic] they big." Johnson pled guilty as a party to the Little Caesars robbery.

During his police interview, Ross denied being in the area on July 13 and said he did not really know Allison. He also denied being in the Wingstop with Allison until Juarezortega showed him a still image from the Wingstop video. In spite of this evidence, Ross denied knowing Allison well, but Juarezortega testified that a search of Damarkevia's Facebook page showed that Damarkevia documented Ross and Allison's friendship by posting several photos of them together at family gatherings and other places.

As to the extraneous-offense evidence, Ross offers many reasons it should have been excluded, but he preserved only a Rule 403 complaint.

Before trial, Ross filed a motion in limine arguing that the probative value of the extraneous Wingstop robbery was substantially outweighed by the danger of unfair prejudice. Ross requested a ruling on his Rule 403 complaint at trial. In response, the State argued that the extraneous offense was admissible under Rule 404(b) and had probative value because it constituted *modus operandi* and identity evidence. Ross never contested the relevancy or admissibility of the evidence under Rule 404(b), even after hearing the State's response. He also failed to argue that the evidence linking Ross to the Wingstop robbery was insufficient to support a finding beyond a reasonable doubt that he committed the extraneous offense. Instead, he simply recited his Rule 403 argument. The trial court overruled his Rule 403 objection and allowed the introduction of the extraneous offense.

On appeal, Ross argues that the extraneous Wingstop robbery was inadmissible under Rules 104(b), 401, 403, and 404(b) of the Texas Rules of Evidence. A "point of error on appeal

6

must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005).

> [A] complaint is not preserved for appeal unless it was made to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."

*Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009) (quoting TEX. R. APP. P. 33.1(a)(1)(A)). "The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint." *Id.*

> Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."

*Id.* at 312–13 (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

The three rules cited by Ross are not interchangeable. Under Rule 401, evidence is relevant if it tends to make a fact of consequence in determining the action more or less probable than it would be without the evidence. TEX. R. EVID. 401. Rule 404 prohibits admissibility of relevant evidence of a person's character or character trait in certain circumstances. TEX. R. EVID. 404. Even if evidence is relevant under Rule 401 and admissible under Rule 404(b), it may nevertheless be excluded under Rule 403 if its probative value is substantially outweighed by a danger of unfair prejudice. TEX. R. EVID. 403. Because each rule has a different purpose, objections made under Rule 403 do not preserve complaints under Rules 401 or 404(b). *See Orellana v. State*, 489 S.W.3d

7

537, 547 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) ("By objecting only on Rule 403 grounds at trial, appellant's trial counsel conceded the relevance of the evidence, claiming instead that it was too prejudicial to be admitted.") (citing *Santellan v. State*, 939 S.W.2d 155, 171 (Tex. Crim. App. 1997)); *Jackson v. State*, 314 S.W.3d 118, 124 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Lopez v. State*, 200 S.W.3d 246, 251 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) ("A rule 403 objection is not implicitly contained in relevancy or 404(b) objections; rather, a specific rule 403 objection must be raised to preserve error.") (citing *Montgomery v. State*, 810 S.W.2d 372, 388 (Tex. Crim. App. 1990) (op. on reh'g) (a Rule 404(b) objection does not preserve a Rule 403 complaint)).

Additionally, a defendant is required to preserve a complaint under Rule 104(b).[3] *James v. State*, 555 S.W.3d 254, 259 (Tex. App.—Texarkana 2018, pet. dism'd, untimely filed). Under Rule 401, the evidence presented by the State at trial must be sufficient to support a finding beyond a reasonable doubt that appellant committed the extraneous offense. *Fischer v. State*, 268 S.W.3d 552, 556 (Tex. Crim. App. 2008). Because a pretrial proffer is not required to "satisfy this burden so long as the evidence presented by the end of trial" does, Rule 104(b) complaints must be preserved in a specific way. *Id.* at 558.

> A trial court may admit questioned evidence as conditionally relevant, carrying along the proponent's accompanying duty to establish that relevancy at a later time. *Rawlins v. State*, 521 S.W.3d 863, 868 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Powell v. State*, 898 S.W.2d 821, 829 (Tex. Crim. App. 1994)). In such a case, if the sponsor of the evidence fails to later establish relevancy, the opponent must renew his original objection to the evidence and request that the trial

---

[3]"When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later." TEX. R. EVID. 104(b).

8

> court instruct the jury to disregard the evidence. *Id.* (citing *Powell*, 898 S.W.2d at 829). Without such an objection, no complaint is preserved for appellate review. *Id.* at 868–69 (citing *Powell*, 898 S.W.2d at 829; *Williams v. State*, 82 S.W.3d 557, 563 (Tex. App.—San Antonio 2002, pet. ref'd); *Heidelberg v. State*, 36 S.W.3d 668, 673 (Tex. App.—Houston [14th Dist.] 2001, no pet.)).

*James*, 555 S.W.3d at 259. The appellate record reveals that Ross did not make a Rule 104 objection at any time. Simply put, he did not take the steps described in *James* that were required to preserve this complaint.

We find that Ross failed to preserve his Rule 104(b), 401, and 404(b) complaints for our review. Instead, we conclude that only a Rule 403 objection was preserved. We now focus on that objection.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *Montgomery*, 810 S.W.2d at 391. We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

When a trial court is considering the application of Rule 403 to challenged evidence, the court balances:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be

9

given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

*Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (footnote omitted). As to *Gigliobianco*'s first factor—the inherent probative force of the extraneous offense—the element of identity was the key issue at trial. The jury heard testimony that Johnson, who admitted her guilt, worked at both Wingstop and Little Caesars, which were located next door to each other. Both robberies were executed in a similar manner with suspects fitting the same description. Damarkevia's car was seen in the parking lot just before the Wingstop robbery and was again identified in the parking lot at the time of the Little Caesars robbery. The trial court could have reasonably concluded that evidence of the Wingstop robbery had considerable probative force on the key issue of identity.

With respect to the State's need for the extraneous offense, Ross maintained his innocence and suggested that it was a coincidence that the robbers' physical description matched his and Allison's appearance in the Wingstop video. He argued that the clothing worn in the Wingstop robbery by the person that looked like him could be found at any store. He also pointed out that the Little Caesars video showed that the heavyset suspect wore different shoes and a hoodie, differing from the heavy robber at Wingstop. To rebut this theory, the State showed that the heavyset suspect wore the same mask in both robberies, that Damarkevia's car was found at the scene of both crimes on the days they were committed, and that Ross admitted to using Damarkevia's car when he was in town. To that end, the trial court could have reasonably concluded that the State had some need for the extraneous offense.

10

As to the third, fourth, and fifth factors, "[w]hile all evidence of extraneous crimes is almost always inherently prejudicial and carries the potential to impress the jury of a defendant's character conformity, this potential is minimized through a limiting instruction." *Heigelmann v. State*, 362 S.W.3d 763, 772 (Tex. App.—Texarkana 2012, pet. ref'd). Here, the trial court instructed the jury that, if it found Ross had committed the extraneous offense, it was only to consider it for permissible reasons under Rule 404(b), including identity, opportunity, and intent. "Absent contrary evidence, we presume that the jury followed the instructions given." *James*, 555 S.W.3d at 261 (citing *Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005)). We find that the proper limiting instruction minimized the potential that the Wingstop robbery would be given undue weight, confuse or distract the jury from the main issue of identity, or cause them to render a decision on an improper basis.

As for the last factor, the jury was shown a still image from the Wingstop video and heard testimony from Fox and Juarezortega about the similarities between the two robberies. However, Ross does not argue, and we do not find, that evidence of the Wingstop robbery consumed an inordinate amount of time.

After weighing the *Gigliobianco* factors, we conclude that the trial court's decision to admit the extraneous-offense evidence in this case fell within the zone of reasonable disagreement and thus was not an abuse of discretion. Accordingly, we overrule Ross' Rule 403 argument.

*(2)*     *Assessing Attorney Fees Was Error*

Under Article 26.05(g) of the Texas Code of Criminal Procedure, a trial court has the authority to order the reimbursement of court-appointed attorney fees only if "the judge determines

that a defendant has financial resources that enable the defendant to offset in part or in whole the costs of the legal services provided . . . , including any expenses and costs." TEX. CODE CRIM. PROC. ANN. art. 26.05(g) (Supp.). "[T]he defendant's financial resources and ability to pay are explicit critical elements in the trial court's determination of the propriety of ordering reimbursement of costs and fees" of legal services provided. *Armstrong v. State*, 340 S.W.3d 759, 765–66 (Tex. Crim. App. 2011) (alteration in original) (quoting *Mayer v. State*, 309 S.W.3d 552, 556 (Tex. Crim. App. 2010)).

Ross was indigent and was represented by appointed trial counsel. Therefore, he was presumed to remain indigent absent record proof of a material change in his circumstances. TEX. CODE CRIM. PROC. ANN. art. § 26.04(p) (Supp.); *Mayer v. State*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010). Since there is no finding that Ross was able to pay attorney fees, and the record contains no proof of a material change in his circumstances, the assessment of attorney fees was erroneous. *See Cates v. State*, 402 S.W.3d 250, 252 (Tex. Crim. App. 2013); *see also Mayer*, 309 S.W.3d 552, 557 (Tex. Crim. App. 2010); *Martin v. State*, 405 S.W.3d 944, 946–47 (Tex. App.—Texarkana 2013, no pet.).

This Court has the power to correct and modify the judgment of the trial court for accuracy when the necessary data and information are part of the record. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) ("The authority of an appellate court to reform incorrect judgments is not dependent on the request of any party, nor does it turn on the question of whether

12

a party has or has not objected in the trial court."). Therefore, we modify the trial court's judgment by deleting the assessment of attorney fees from the judgment.

We delete the order to pay attorney fees from the judgment and affirm the trial court's judgment, as so modified.

Josh R. Morriss, III
Chief Justice

Date Submitted:     May 20, 2019
Date Decided:       May 30, 2019

Do Not Publish

13