**Opinion issued December 15, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00140-CR

———————————

**DAMIEN DOUGLAS HARRIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 428th District Court**
**Hays County, Texas**
**Trial Court Case No. CR-17-0781-D**

---

### DISSENTING OPINION

This is an appeal from a conviction for murder. Damien Douglas Harris fatally

shot Terrence Valentine after a drug deal went awry. At trial, the defense maintained

Harris killed Valentine in self-defense. The jury disagreed, finding Harris guilty.

In the charge, the trial court instructed the jury on self-defense. The instructions identified circumstances under which a defendant's belief that deadly force was immediately necessary is presumed to be reasonable. *See* Tex. Penal Code § 9.32(b). Among other things, this instruction informed the jury that to qualify for the presumption, the defendant must not have been engaged in criminal activity, other than minor traffic violations, when he used deadly force. *See id.*

While deliberating as to whether Harris was guilty, the jury sent a note asking the trial court about the charge's instruction on the presumption of reasonableness. The jury expressed confusion about the instruction's provision that the presumption of reasonableness does not apply when a defendant is engaged in criminal activity. Specifically, the jury asked the trial court, "[D]oes the admitted commission of a crime, sale of a controlled substance, negate the basis of a claim of self-defense?"

Defense counsel asked the trial court to answer the jury's question in the negative. Instead, the trial court answered by stating that the law did not allow the trial court to answer the jury's question, referring the jury to the instructions already contained in the charge, and advising the jury to continue its deliberations in accord with these instructions. In other words, the trial court effectively told the jury to make sense of the presumption-of-reasonableness instruction on its own.

The majority holds that the trial court did not err in refusing to substantively answer the jury's question. The majority reasons that the instruction at issue

2

accurately stated the law and is not confusing. The majority further reasons that answering the jury's question would have impermissibly endorsed Harris's self-defense claim by deemphasizing that he was engaged in criminal activity when he used deadly force while emphasizing Valentine's criminal conduct at the time.

I disagree. While the presumption-of-reasonableness instruction correctly stated the law, the instruction did not answer the jury's question. At best, the answer the jury sought might be inferred from the charge when read as a whole. But the jury's question shows it did not make this inference. Proper instructions must give the jury all the applicable law, rather than supplying parts from which the jury may cobble together all the applicable law for itself. Answering the jury's question would not have endorsed Harris's self-defense theory, and the trial court's refusal to answer makes it impossible on appeal to tell whether the jury correctly applied the law.

I therefore respectfully dissent.

## BACKGROUND

A grand jury indicted Harris for the offense of murder, alleging that he intentionally and knowingly caused Valentine's death by shooting him with a firearm. Harris pleaded not guilty, and the charged offense was tried to a jury.

Five people were present when Harris shot Valentine: Devin Bethea and Harris, who were there to sell prescription cough syrup; Valentine and Joseph Massey, who were there to buy the syrup; and Ty-Zay Wilson, who introduced the

3

buyers to the sellers and rented the apartment where they met. Of these five, Massey and Wilson testified. Valentine was dead. Harris exercised his right not to testify. No one called Bethea to testify, possibly because he was facing his own charge for the misdemeanor offense of failing to report a felony—Valentine's murder.

## Wilson's Testimony

Wilson previously was enrolled at Blinn College and later transferred to Texas State University. Valentine had been Wilson's roommate at Blinn for about two-and-half years. Bethea had been Wilson's roommate at Texas State for a year.

Wilson remained in contact with both Valentine and Bethea afterward. Wilson put Valentine in touch with Bethea, who had prescription cough syrup—promethazine with codeine—for sale. Valentine was interested in buying it.

Wilson agreed to let the parties buy and sell the cough syrup at his apartment. Wilson said the transaction had four participants: Bethea and Harris as sellers and Valentine and Massey as buyers. Wilson disclaimed any role in the sale.

Valentine arrived with Massey, whom Wilson did not know. Valentine and Massey counted their money while Wilson played a video game. Wilson noticed Valentine had a pistol in his lap. Wilson indicated that Valentine was paranoid. Valentine asked about Bethea, stating that if Bethea tried to rob him, Valentine would just take the cough syrup. Wilson tried to reassure Valentine that he had nothing to worry about because Bethea was not the kind of guy who would do so.

Bethea and Harris later arrived at Wilson's apartment. When they arrived, Harris was carrying a cardboard box containing the prescription cough syrup.

Valentine and Massey and Bethea and Harris met in Wilson's kitchen. Wilson went to his room and then returned to the kitchen. When Wilson returned, Bethea and Harris were counting money. Valentine and Massey were standing nearby.

Wilson then heard either Bethea or Harris say that Valentine and Massey were short. At this point, Massey asked Valentine where the rest of the money was. Valentine replied that he had the rest of the money in his wallet. But Harris responded by packing up the cough syrup and stating there would be no sale.

When Harris tried to leave with the cough syrup, Valentine "bum rushed" him. Valentine pressed his body into Harris, who either was knocked backward as a result of Valentine's physical contact or backed up on his own. At this point, Harris and Valentine both reached into their respective waistbands to draw pistols. Wilson testified that Harris and Valentine did so at "literally almost the same time."

Wilson did not know who drew their pistol first because when Harris and Valentine reached into their respective waistbands, Wilson turned around and fled from the apartment. As Wilson was fleeing, he heard two gunshots fired behind him. Wilson stated that there was a momentary beat or pause between the two shots.

Wilson did not call the police after reaching safety. He did not return to his apartment until after the police arrived on the scene. Even then, he did not go inside.

Weeks later, Wilson viewed a photo line-up. Wilson identified Harris.

On cross-examination, defense counsel asked Wilson if he had previously told a detective that Valentine intended to rob Bethea and Harris all along. Wilson denied that Valentine ever said so before the transaction fell through. Wilson insisted he did not know anything was amiss until either Bethea or Harris said that the money was short. But Wilson acknowledged that he became concerned when Valentine voiced his intent to take the cough syrup by force if the deal went sideways. In retrospect, knowing the money was short, he understood why Valentine was paranoid.

Wilson agreed that Valentine was a big man. Valentine had played football at Blinn College. He stood about 6 feet tall and weighed around 300 pounds. When a detective investigating the shooting asked Wilson whether he thought Harris had shot Valentine in self-defense, Wilson said he thought Harris had defended himself. But Wilson conceded that he did "not really" understand the law of self-defense.

The State granted immunity to Wilson in exchange for his testimony. But the subject of Wilson's immunity deal was not broached in front of the jury.

**Massey's Testimony**

Massey had been close friends with Valentine for years and was living with him at the time of the shooting. According to Massey, Valentine invited him on a trip to meet a friend in San Marcos, where Wilson resided. But Massey testified he

6

did not know they were going to meet Wilson or that Valentine was going there to buy prescription cough syrup before they arrived at Wilson's apartment.

Massey said Valentine had a large sum of money. But Massey denied that he knew Valentine had a firearm in his possession on the day of the shooting.

When Valentine and Massey arrived at Wilson's apartment, Massey learned that Valentine's money was counterfeit and Valentine intended to use this counterfeit money to buy promethazine. Massey was familiar with counterfeit money, as he had used counterfeit money to buy things in the past. But Massey denied knowing Valentine intended to take the cough syrup if the deal went awry.

Massey did not know Wilson. Nor did Massey know Bethea or Harris.

When Bethea and Harris arrived, Harris was carrying a box. They came into the apartment, and Harris set the box down on the kitchen island. Bethea and Harris then spoke with Valentine about the cough syrup. Massey denied he was involved.

Either Bethea or Harris opened the box, which contained bottles. Massey said the bottles appeared to contain prescription cough syrup. Valentine gave Bethea and Harris the counterfeit money, and Bethea and Harris began counting the money.

Massey first knew the deal had gone wrong when Harris looked up and made eye contact. According to Massey, Harris had an angry expression on his face, presumably having discovered that Valentine's money was counterfeit. Harris then picked up the box of bottles and began walking toward the apartment's front door.

7

Valentine grabbed Harris by his shirt collar and pushed him up against a wall. At this point, the two were standing face-to-face. Harris reached for his pistol and shot Valentine. Massey said he did not see Valentine reach for a pistol at any time.

But Massey does not appear to have witnessed the actual shooting. He testified that he ducked behind the kitchen island as Harris reached for his pistol. Massey heard a single gunshot while he was behind the island. Massey then fled upstairs.

Massey returned downstairs a short while later. When Massey returned, he saw Valentine lying facedown on the floor. Valentine had been shot in "the face area," and there was a lot of blood. A small pistol lay next to Valentine. No one else remained in the apartment. Bethea, Harris, and Wilson had all apparently left.

Massey called 911. He also tried to render first aid to Valentine.

Before the police arrived, Massey picked up the pistol and placed it behind a nearby air conditioning unit outside. He agreed he was trying to hide the pistol. He also hid the counterfeit money. He did not want the police to see the pistol or money. In addition, Massey took Valentine's cell phone and put it in one of his own pockets.

Weeks later, Massey viewed a photo line-up. Massey identified Harris.

On cross-examination, defense counsel confronted Massey with a text message he sent to Valentine the day before the shooting. Massey wrote: "I forgot that lick tomorrow." Massey testified that the term *lick* means "any exchange from hand to hand that involves money." He admitted that a "lick can be a robbery." But

8

Massey denied that he and Valentine planned to rob Bethea and Harris, even as a contingency plan in the event that the spuriousness of their money was discovered.

Defense counsel also confronted Massey with prior videotaped interviews Massey gave to a detective. In one interview, Massey admitted he knew he and Valentine were traveling to San Marcos for "a drug thing" before they arrived. Massey also admitted that he "was trying to get some" cough syrup for himself.

During cross-examination, Massey admitted he put Valentine in touch with the person who supplied Valentine with the counterfeit money. But Massey only admitted this after being confronted with a prior statement he had made.

The State granted immunity to Massey in exchange for his testimony. Massey testified he had been prepared to testify without an immunity deal, which was brokered only after defense counsel suggested he could face criminal charges.

**Other Witnesses**

The jury heard from several other witnesses, none of whom were eyewitnesses to the aborted drug deal or shooting. These other witnesses included Valentine's mother, a medical doctor employed by the Travis County Medical Examiner's Office, several peace officers with the San Marcos Police Department who responded to the shooting, two investigating detectives, a crime-scene evidence supervisor, a forensic scientist employed by the Texas Department of Public Safety, and a forensic scientist and crime-scene analyst who testified as a defense expert.

9

Valentine's mother testified her son had played football in high school both as a defensive and offensive tackle. He was an inch or two under six feet tall.

Dr. Leisha Wood was the medical examiner who autopsied Valentine's body. She testified Valentine "had a gunshot wound on the posterior left side of the head." The gunshot wound was located about four inches below the top of his head. Based on the autopsy, Wood concluded the bullet had ricocheted inside his skull. The trajectory of the bullet "was left to right, slightly back to the front, and upward." Wood testified Valentine had been shot a single time, which was fatal and likely would have immediately incapacitated Valentine. Wood examined Valentine's body for other injuries but did not see any other signs of injury on his body that would indicate Valentine had been in a fight or struggle before he was shot. Wood classified Valentine's cause of death as homicide. But she agreed that homicide is not the same thing as murder. By homicide, Wood meant only that he had died at another's hands. For medical examiners, this classification is not a legal determination of guilt.

On cross-examination, Wood agreed there were five bullet holes in the hooded sweatshirt Valentine was wearing despite there being just one gunshot wound. Wood further agreed that these holes indicated the sweatshirt was not pulled smoothly over Valentine's head when he was shot. When asked whether this bunching could be consistent with a fight or physical struggle, Wood answered, "It could be." Wood

also agreed that the absence of other injuries did not exclude the possibility that Valentine had been involved in a fight or struggle before he was shot and killed.

When Wood said the gunshot wound likely immediately incapacitated Valentine, she meant he would have had no motor skills afterward. Wood agreed it was very unlikely that Valentine returned fire after being shot in this case. But she also acknowledged Valentine still could have had involuntary body movements, like muscle contractions, though she did not know how common this would be. For an involuntary movement to result in Valentine firing his own pistol, however, his finger already would have to have been on the trigger when he was shot by Harris. Wood agreed the likelihood of firing a pistol in this involuntary manner would be pretty low. Wood also testified there are "rare exceptions" when "somebody receiving a head wound like that" would not be immediately incapacitated.

When peace officers arrived at Wilson's apartment, only Massey remained there. Wilson had fled and did not return until later. Bethea and Harris had fled.

One of the peace officers who responded to the scene after the shooting testified there were two shell casings near Valentine's body. The casings were from bullets of different calibers, which could not have been fired from the same pistol. Officers found a pistol matching one of these calibers behind the air conditioning unit. The officers also found the counterfeit money hidden underneath a mattress.

11

A few days after the shooting, Detective M. Casillas searched Wilson's apartment to find the second bullet that had been fired. During this search, Casillas found a blemish in a couch leg. The floor near this couch leg was also blemished. The second bullet—the one fired from Valentine's pistol—was in the couch leg.

Casillas stated he made this search of Wilson's apartment based on witness interviews. Wilson told Casillas and the lead investigator, Detective D. Templeton, that both Valentine and Harris had pistols at the time of the shooting. But based on Wilson's interview, Casillas understood Harris to have reached for his pistol first.

Templeton also testified about the interviews of Wilson and Massey. Templeton said Wilson indicated that Valentine pushed Harris—whose identity Wilson did not yet know—up against a wall and reached for his pistol, possibly in response to Harris having drawn his own pistol from his waistband. Templeton also learned of Bethea's involvement from Wilson during this interview. Templeton located Bethea afterward, but Bethea did not cooperate with the investigation.

Based on an examination of Bethea's phone or phone records, Templeton learned that Bethea and Harris interacted many times near the timeframe of the shooting. Templeton then showed a photo line-up to Wilson and Massey. Both identified Harris as the person who had accompanied Bethea and shot Valentine.

Templeton testified he was familiar with the term *lick*. According to Templeton, this term signifies a robbery or a burglary. Finally, Templeton testified that promethazine is a prescription-only cough syrup, which comes in bottles.

Sean Daniel, a forensic scientist with the Texas Department of Public Safety, removed the bullet from the couch leg. Based on his testing and examination, Daniel determined this bullet was fired from Valentine's pistol. Daniel also testified that the two bullets fired in this case could not have been fired from the same pistol.

Daniel also testified that he performed a "drop test analysis" on Valentine's pistol. The purpose of this analysis is to determine whether a pistol can accidentally discharge if it is dropped. Valentine's pistol did not do so when Daniel tested it. Based on this testing, Daniel agreed that one would have to apply full pressure to the trigger for the pistol to fire. According to Daniel, one would have to apply "a little over five pounds" of pressure on the trigger of Valentine's pistol to make it fire.

Tammy Barnette, a forensic scientist and crime-scene analyst who previously worked for the Houston Forensic Science Center, testified for the defense. She analyzed the trajectory of the bullet fired from Valentine's pistol. Barnette concluded the bullet fired from his pistol hit the floor and then ricocheted into the couch leg.

On cross-examination, Barnette agreed that Valentine was shot in the back of the head. She also agreed that Valentine's hooded sweatshirt appeared to have been pulled up over his head because there was a hole through the sweatshirt's hood.

13

## Jury Charge and Charge Conference

In the charge, the trial court instructed the jury on self-defense. The instructions identified circumstances under which a defendant's belief that deadly force was immediately necessary to protect himself is presumed to be reasonable. *See* PENAL § 9.32(b). Among other things, this instruction informed the jury that to qualify for the presumption, the defendant must not have been engaged in criminal activity, other than minor traffic violations, when he used deadly force. *See id.*

The parties had an opportunity to review the trial court's proposed charge before it was given to the jury. The trial court held a charge conference after both sides rested. Neither side objected to the jury charge's self-defense instructions.

## Jury's Question about the Charge

While deliberating as to whether Harris was guilty, the jury sent a note asking the trial court about the charge's instruction on the presumption of reasonableness. The jury expressed confusion about the instruction's provision that the presumption of reasonableness does not apply when a defendant is engaged in criminal activity. Specifically, the jury asked the trial court, "[D]oes the admitted commission of a crime, sale of a controlled substance, negate the basis of a claim of self-defense?"

Defense counsel asked the trial court to answer the jury's question in the negative. Instead, the trial court answered by stating that the law did not allow the trial court to answer the jury's question, referring the jury to the instructions already

14

contained in the charge, and advising the jury to continue its deliberations in accord with these instructions. The jury did so and eventually reached a verdict.

## Jury Verdict and Judgment

The jury found Harris guilty of murder as charged in the indictment and assessed his punishment at 20 years of imprisonment. The jury did not assess a fine. The trial court entered a judgment of conviction in accord with the jury's verdict.

## Motion for New Trial

Harris moved for a new trial. As grounds for new trial, he asserted the trial court failed to properly answer the jury's question about the presumption of reasonableness. He also asserted that the presumption of reasonableness was inapplicable on the facts of this case and should not have been included in the charge.

Nothing in the record shows that Harris's new-trial motion was set for hearing or heard. The motion was denied by operation of law. *See* TEX. R. APP. P. 21.8(c).

## DISCUSSION

Harris contends the trial court erred in refusing to answer the question the jury asked about the presumption of reasonableness in the context of self-defense. He maintains the jury's question indicated the jury was uncertain as to whether his own criminal activity, possessing prescription cough syrup with the intent to sell it, categorically precluded the possibility that he shot Valentine in self-defense. So, in refusing to answer the question, Harris asserts, the trial court negated the defense.

15

## A. Standard of review

When a trial court substantively answers a question from the jury during deliberations, the court's answer amounts to an additional or supplemental jury instruction. *Daniell v. State*, 848 S.W.2d 145, 147 (Tex. Crim. App. 1993). But when, as here, the trial court refuses to answer the jury's question or merely refers the jury to the instructions already given, the court's refusal to answer or reference to the instructions given is not an additional or supplemental jury instruction. *Id.*

The question in this appeal is whether the jury's question was proper. If the request was a proper one on a question of law, Article 36.27 of the Code of Criminal Procedure obligated the trial court to substantively answer with an additional or supplemental instruction. *Gamblin v. State*, 476 S.W.2d 18, 20 (Tex. Crim. App. 1972); *Wade v. State*, 164 S.W.3d 788, 794–95 (Tex. App.—Houston [14th Dist.] 2005, no pet.). If not, the trial court did not err in refusing to give an additional or supplemental instruction. *Gamblin*, 476 S.W.2d at 20; *Wade*, 164 S.W.3d at 795.

In deciding whether a jury's question was proper and thus required an additional or supplemental instruction, we are guided by the principles that apply to the contents of the jury charge. *See Allaben v. State*, 418 S.W.2d 517, 521 (Tex. Crim. App. 1967); *Barrera v. State*, 10 S.W.3d 743, 747 (Tex. App.—Corpus Christi 2000, no pet.). This is so because any additional or supplemental instruction that the

trial court gives to the jury must generally comply with the same rules that govern the charge itself. *Lucio v. State*, 353 S.W.3d 873, 875 (Tex. Crim. App. 2011).

Article 36.14 of the Code of Criminal Procedure governs the charge. *Daniell*, 848 S.W.2d at 147. It requires the charge to distinctly set forth the law applicable to the case. TEX. CODE CRIM. PROC. art. 36.14. This includes defensive issues, like self-defense, when raised by the evidence and properly requested. *Mendez v. State*, 545 S.W.3d 548, 552–53 (Tex. Crim. App. 2018). Article 36.14 also bars the charge from doing several things. The charge cannot express an opinion on the weight of the evidence, summarize the testimony, discuss the facts, or include argument calculated to provoke the jury's sympathy or passions. *Lucio*, 353 S.W.3d at 875.

If the trial court erred in refusing to give an additional or supplemental instruction, then we must assess whether the error harmed the defendant. *Daniell*, 848 S.W.2d at 147–48 & n.4. When, as here, the defendant objected to the trial court's refusal to give an additional or supplemental instruction in answer to the jury's question, we must reverse if the error caused him some harm. *Heigelmann v. State*, 362 S.W.3d 763, 775–76 (Tex. App.—Texarkana 2012, pet. ref'd).

Some harm means actual harm, not merely theoretical harm. *Jordan v. State*, 593 S.W.3d 340, 347 (Tex. Crim. App. 2020). Under this standard, we must reverse if the error was calculated to injure the defendant's rights. *Id.* This means that the presence of any harm, regardless of degree, requires reversal. *Chambers v. State*,

17

580 S.W.3d 149, 154 (Tex. Crim. App. 2019). That is, we can only affirm if the error is harmless. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

Neither side bears a burden of proof with respect to showing harm. *Rogers v. State*, 550 S.W.3d 190, 191 (Tex. Crim. App. 2018). Instead, we must make our own assessment as to whether some harm occurred. *Elizondo v. State*, 487 S.W.3d 185, 205 (Tex. Crim. App. 2016). In making our review for harm, we look at the entire record, including the jury charge, contested issues, weight of the evidence, arguments of counsel, and other relevant information. *Jordan*, 593 S.W.3d at 347.

## B. Applicable law

To be justified in using deadly force against another, the actor must reasonably believe that deadly force is immediately necessary for one of two purposes: to protect the actor against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of certain felonies, including murder, robbery, and aggravated robbery. PENAL § 9.32(a). Under certain circumstances, the actor's belief that deadly force is immediately necessary is presumed to be reasonable. *Id.* § 9.32(b). This presumption applies when the actor:

(1) knew or had reason to believe that the person against whom the deadly force was used:

(A) unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

(B) unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

(C) was committing or attempting to commit [specified offenses, which include murder, robbery, and aggravated robbery];

(2) did not provoke the person against whom the force was used; and

(3) was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

*Id.*

But failure to satisfy the conditions required for the presumption of reasonableness to apply does not bar a claim of self-defense. *Rogers*, 550 S.W.3d at 193. If the presumption does not apply, the reasonableness of the actor's belief that deadly force was immediately necessary presents a fact issue for the jury to resolve based on the evidence admitted at trial. *See id.* (self-defense must be submitted to jury if issue is raised by evidence even when that evidence is disputed or weak).

## C. Analysis

### 1. The trial court erred in refusing to answer the jury's question.

The defense argued that Harris shot Valentine in self-defense. The charge therefore instructed the jury on self-defense. As part of the instruction on self-defense, the charge included the following explanation as to when an actor's belief that deadly force was immediately necessary is presumed to be reasonable:

19

Presumption

An actor's belief that deadly force was immediately necessary is presumed to be reasonable if:

1. the actor knew or had reason to believe that the person against whom the deadly force was used:

   a. unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation, vehicle, or place of business or employment;

   b. unlawfully and with force removed, or was attempting to remove unlawfully and with force, the actor from the actor's habitation, vehicle, or place of business or employment; or

   c. was committing or attempting to commit aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery; and

2. the actor did not provoke the person against whom the force was used; and

3. the actor was not otherwise engaged in criminal activity, other than a Class C misdemeanor that is a violation of a law or ordinance regulating traffic at the time the force was used.

If you find the State has disproved one or more elements of 1, 2, or 3 listed above, the presumption does not apply and you are not required to find that the actor's belief was reasonable.

*See* PENAL § 9.32(b).

But the charge did not explain the nature of presumptions in general. *See id.* § 2.05(b)(2) (requiring trial court to give certain instructions to jury with respect to presumptions that favor defendant). Nor did the charge instruct the jury how the presumption of reasonableness interacted with the remainder of the instructions on self-defense beyond the statement that the jury was not required to find the

20

defendant's belief that deadly force was immediately necessary reasonable if the State disproved one of the elements needed for the presumption to apply.

The instruction on the presumption of reasonableness confused the jury during its deliberations. The jury sent a note to the trial court asking: "[D]oes the admitted commission of a crime, sale of a controlled substance, negate the basis of a claim of self-defense?" But the trial court refused to the answer the jury's question. Instead, the trial court informed the jury: "You have been given the law." The trial court also checked a box on its response form that stated: "The court under the law is not permitted to answer the question that you have presented. Please refer to and follow the instructions already given to you, and continue your deliberations."

The trial court was mistaken in its conclusion that the law disallowed it from answering the jury's question. The jury's question was a proper one. It requested further instruction on the law applicable to the facts of the case. The applicable law is an appropriate subject for an additional or supplemental jury instruction. TEX. CODE CRIM. PROC. art. 36.14. Moreover, the trial court could have answered the jury's question with a simple "no." While the presumption of reasonableness does not apply when a defendant is engaged in criminal activity, his criminal activity does not disallow a jury from finding he acted in self-defense. *Rogers*, 550 S.W.3d at 193; *Barrios v. State*, 389 S.W.3d 382, 393 (Tex. App.—Texarkana 2012, pet. ref'd).

When, as here, the jury expresses confusion about a rule of law based on the wording of the charge and the trial court can dispel the jury's confusion with a simple additional or supplemental instruction, the trial court does not err by giving one. Two decisions suffice to show that a trial court does not err in so instructing the jury.

In *Bonner v. State*, the defendant was tried for aggravated robbery. 820 S.W.2d 25, 26 (Tex. App.—Houston [14th Dist.] 1991, pet. ref'd). At trial, there was testimony that the defendant threatened employees with a knife while trying to leave a store with stolen merchandise. *Id.* During deliberations, the jury sent the trial court a note effectively asking two questions: whether the defendant has to threaten harm while trying to take property to be guilty of robbery or whether the defendant could still be guilty of robbery even if he threatened harm during his flight from the robbery. *Id.* at 29. The trial court answered the first question "no" and the second question "yes," elaborating that the law provided that a threat "does not have to be made while the actor is attempting to obtain or maintain control of the property, it may be made during the commission of flight or attempted flight." *Id.* On appeal, the defendant challenged this supplemental instruction as an improper comment on the weight of the evidence. *Id.* Noting that the trial court's supplemental instruction was a correct statement of the law and did not refer to any evidence, the court of appeals held that the trial court did not err in giving the instruction. *Id.*

In *Bell v. State*, the defendant was tried for sexual performance by a child and other sex offenses. 326 S.W.3d 716, 718 (Tex. App.—Dallas 2010, pet. dism'd). At trial, the defendant testified that the 12-year-old child had told him she was 19 years old. *Id.* at 719–20. During deliberations, the jury asked the trial court two interrelated questions: whether the fact that the defendant thought he was misled about the child's age was a factor in deciding he did not know he was committing a crime and whether being misled in this regard was a defense. *Id.* at 722. In response, the trial court answered that being mistaken about the child's age "is not a defense." *Id.* at 722–23. On appeal, the defendant challenged the instruction on the ground that it assumed the truth of a contested fact—whether he was aware of the child's true age—and thus was an improper comment on the weight of the evidence. *Id.* at 723. Given that the defendant's knowledge of the child's age was not relevant to the defendant's guilt as a matter of law, the court of appeals held that the trial court did not err in answering the jury's question with the supplemental instruction that a mistaken belief as to the child's age was not a defense. *Id.* at 723–24.

In contrast, a trial court properly refuses to give an additional or supplemental instruction when the charge already answers the jury's question. *E.g.*, *Ash v. State*, 930 S.W.2d 192, 195–96 (Tex. App.—Dallas 1996, no pet.). But this is not the case here. The charge did not explicitly instruct the jury that it could find Harris acted in self-defense even if he was engaged in criminal activity. At best, the jury might have

23

inferred this rule of law from the existing jury instructions. But the jury's question evincing confusion on this very matter shows it had not in fact made this inference. Furthermore, the jury should not have to infer the law applicable to the case. It is the role of the trial court to instruct the jury on the law. TEX. CODE CRIM. PROC. art. 36.13. When the charge contains a gap that causes the jury to be uncertain about the applicable law, the trial court must fill that gap with an additional or supplemental instruction rather than leaving the jury to work out the law on its own. TEX. CODE CRIM. PROC. art. 36.14, 36.16; *see also Reeves*, 420 S.W.3d at 818 (purpose of jury charge is not merely to avoid confusing jury but to prevent confusion).

In its motion for en banc reconsideration, the State argues that decisions like *Bonner* and *Bell* are inapposite. The State posits that the correct inquiry on appeal is not whether the trial court would have reversibly erred by answering the jury's question had it done so, but rather whether the trial court reversibly erred in not answering, given that the charge correctly stated the law as to the presumption.

The majority is silent on this point. The State's position is untenable.

The distinction the State proposes falls apart when one examines the trial court's ruling. The State correctly says that the trial court refused to answer the jury's question, and I agree that the trial court's refusal to answer the question is the ruling this court must review. But the trial court refused to answer the jury's question and instead referred the jury to the existing instructions in the charge based on an error

24

of law. Specifically, the trial court concluded and informed the jury that "under the law" the court was "not permitted to answer the question" the jury asked in its note. *Bonner* and *Bell*, in which trial courts substantively answered the jury's questions and were affirmed on appeal, demonstrate that the law did not disallow the trial court from answering the jury's question about the presumption of reasonableness.

In this case, the jury asked the trial court to answer a straightforward question about the applicable law after retiring to deliberate: "[D]oes the admitted commission of a crime, sale of a controlled substance, negate the basis of a claim of self-defense?" As the Court of Criminal Appeals has long said, the trial court was obliged to answer the jury's question: "If the jury after retirement request[s] additional instructions upon a question of law and the subject matter of the request is proper there can be no question but [t]hat the [c]ourt should give such instructions in writing." *Walker v. State*, 440 S.W.2d 653, 659 (Tex. Crim. App. 1969); *accord Lucio*, 353 S.W.3d at 875 n.2 (citing and quoting *Walker*, 440 S.W.2d at 659, and *Gamblin*, 476 S.W.2d at 20, for principle that Article 36.27 of the Code of Criminal Procedure requires trial courts to answer proper jury questions about the law).

Here, the trial court's refusal to substantively answer the jury's question creates a problem like the one appellate courts face in civil cases when a charge commingles valid and invalid theories of recovery in a single broad-form liability question. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 389 (Tex. 2000). Given

25

the confusion evinced by the jury's question, it is possible that the jury rejected Harris's claim of self-defense for an invalid reason. Namely, the jury could have found that Harris was engaged in criminal activity when he used deadly force and mistakenly believed that this fact negated his claim of self-defense. Due to the general guilty verdict returned by the jury, we have no way of knowing whether the jury rejected Harris's self-defense claim for this invalid reason or for a valid one. *Cf. Owens v. State*, 827 S.W.2d 911, 917 (Tex. Crim. App. 1992) (no way to tell whether jury considered extraneous act evidence for proper or improper purpose given that limiting instruction given by trial court did not include proper purpose at issue).

Of course, we presume the jury understood and followed the charge absent evidence to the contrary. *Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011). Here, however, the jury's note asking about the applicable law evidences that it did not understand the charge. *See, e.g.*, *Castillo-Fuentes v. State*, 707 S.W.2d 559, 562–63 (Tex. Crim. App. 1986) (note jury sent to court during deliberations asking question about applicable law showed jury was confused by instructions); *Dolkart v. State*, 197 S.W.3d 887, 894 (Tex. App.—Dallas 2006, pet. ref'd) (same); *see also Luquis v. State*, 72 S.W.3d 355, 367 (Tex. Crim. App. 2002) (indicating that jury notes could indicate or express confusion as to how to apply law stated in charge). We cannot presume the jury understood the charge because the jury said it did not.

*See Elizondo*, 487 S.W.3d at 208 (ordinary presumption that jury followed written instructions does not apply when written instructions are not understandable).

Disregarding the jury's manifestation of confusion, the State maintains the presumption instruction itself was accurate and there is no indication the jury failed to heed this instruction. Citing *Colburn v. State*, the State argues the jury's note does not support Harris's position that the jury was confused in a way that could have led it to misapply the presumption as barring his self-defense claim. *See* 966 S.W.2d 511, 519 (Tex. Crim. App. 1998) (jury note did not overcome presumption that jury followed court's instruction). The majority accepts the State's argument, citing *Colburn* in support of its decision. But *Colburn* itself refutes the State's argument.

*Colburn* was a capital murder case. *Id.* at 512. While deliberating on punishment issues relevant to whether the defendant would receive a life sentence or the death penalty, the jury sent a note to the trial court asking if the defendant would be eligible for parole if he received a life sentence. *Id.* at 513, 519. Because Texas law forbids consideration of parole, the trial court answered by instructing the jurors that the law prohibited them from considering parole. *Id.* On appeal, the defendant contended that the trial court erred in giving the instruction because it indirectly informed the jury that he was eligible for parole. *Id.* The defendant further contended that the jury's note showed that the jury considered parole. *Id.* at 519–20. Reasoning that the trial court's instruction correctly stated the law and did not imply

27

that the defendant could be eligible for parole, the Court held that the trial court did not err in instructing the jury on the law. *Id.* at 520. The Court further held that there was no evidence rebutting the presumption that the jury did as it was instructed. *Id.* The sole potential evidence that the jury improperly considered parole consisted of its note to the trial court. *Id.* As to the note, the Court observed that even if the note indicated the jury had considered parole at a preliminary point, the trial court then instructed the jury not to do so, and there was no evidence the jury disobeyed. *Id.*

But a note from the jury asking about parole ordinarily supports a strong inference that the jury improperly considered parole. *Smith v. State*, 830 S.W.2d 926, 928 (Tex. Crim. App. 1991) (per curiam). The note in *Colburn* did not do so only because the trial court's subsequent instruction negated this ordinary inference. *See* 966 S.W.2d at 519–20. That is, *Colburn* is a case in which the trial court correctly remedied a problem evidenced by a jury note with an instruction to the jury. *Id.*

In sum, *Colburn* supports Harris's position. There, the Court discounted any evidentiary value the jury's note might possess because the trial court responded with an instruction, which the reviewing court presumed the jury heeded. Here, in contrast, the trial court refused to answer the jury's question. The jury's unanswered question rebuts the presumption that the jury understood and followed the law as set forth in the charge. In reality, the State asks us to apply a very different presumption: a presumption the jury correctly answered its own question. That presumption would

improperly place the jury in the position of deciding the applicable law, rather than applying the law given by the court. *See DeLay v. State*, 410 S.W.3d 902, 915 (Tex. App.—Austin 2013) (jury's unanswered questions about law improperly left it to decide what law required), *aff'd*, 465 S.W.3d 232 (Tex. Crim. App. 2014).

The State also argues the trial court could not answer the jury's question without improperly commenting on the weight of the evidence by drawing the jury's attention to particular evidence and implicitly endorsing Harris's claim of self-defense. The majority accepts the State's argument. The law is to the contrary.

The jury asked if the trial court's presumption-of-reasonableness instruction meant that Harris could not claim self-defense if he was engaged in criminal activity when he used deadly force. This question is a legal one, the applicable law is straightforward, and the trial court could have correctly answered with a simple "no." That answer would not implicitly endorse either side's theory of the case.

Assuming for argument's sake that a simple "no" could have somehow been suggestive, it still would not have been an improper comment on the weight of the evidence. This is so for two reasons, neither of which the State acknowledges.

First, the jury's question concerned an instruction on a presumption. When a presumption exists, the trial court necessarily calls specific evidence to the jury's attention in the charge. *Bartlett v. State*, 270 S.W.3d 147, 151 (Tex. Crim. App. 2008). Doing so is not an improper comment on the weight of this evidence. *Id.*; *see*

*also Walters v. State*, 247 S.W.3d 204, 211–12 & n.35 (Tex. Crim. App. 2007) (noting that statutory presumption of reasonableness in particular calls specific evidence to jury's attention and that instructing on presumption is therefore proper). For the same reason, the trial court would not have been improperly commenting on the weight of the evidence by answering the jury's question about this instruction.

Second, it was the jury who singled out the specific evidence at issue—engaging in criminal activity—by asking the question that it did. Had the trial court answered with a correct and neutral statement describing the applicable law, it would not have been making an improper comment on the evidence's weight. *Lucio*, 353 S.W.3d at 876–77. As the Court of Criminal Appeals has held, trial courts can provide instructions of this nature in response to jury questions asked during deliberations even when including such an instruction in the original charge would have constituted an improper comment on the weight of the evidence. *Id.*

## 2. The trial court's refusal to answer the jury's question was harmful.

The trial court's refusal to answer the jury's question left the jury on its own to make sense of the law governing self-defense, which was the pivotal disputed issue at trial. That Harris fatally shot Valentine was undisputed. The crux of the trial was whether Harris was justified in doing so. The parties hotly contested this issue.

There was conflicting evidence about the circumstances of the shooting to be sure. But substantial evidence supported Harris's claim of self-defense. To wit:

Wilson, who was one of only two testifying eyewitnesses to the shooting, stated that Valentine arrived armed and paranoid. Wilson also testified that Valentine physically accosted Harris when Harris tried to depart. The second eyewitness, Massey, likewise testified that Valentine accosted Harris as Harris tried to leave.

According to Wilson, in the ensuing confrontation, both men reached for their pistols virtually simultaneously. Wilson thought Harris had acted in self-defense.

It is undisputed that Valentine was physically imposing due to his stature. He was just under six feet tall, weighed around 300 pounds, and had a large build.

It is also undisputed that both Valentine and Harris fired their pistols. The bullets and shell casings recovered show that each man fired his pistol just once.

Text messages show that Valentine's confederate, Massey, referred to the drug deal as a *lick*. Massey conceded one possible meaning of this term is robbery. That is how Templeton, one of the investigating detectives, understood the term.

Wood, the medical examiner, conceded it was possible based on the evidence that Valentine had been engaged in a physical struggle when he was fatally shot. She testified that it was very unlikely Valentine fired his pistol after having been shot due to the nature of his injury, which most likely incapacitated him immediately.

In sum, while there is contrary evidence as well, substantial evidence exists that raises and supports the possibility that Harris shot Valentine in self-defense.

The State's closing argument underscores the pivotal role Harris's self-defense claim played at trial. The State's argument also shows that the context in which Harris claimed to act in self-defense—an aborted drug deal—loomed large.

The State began with a question: "When two guys take guns to a drug deal and one ends up dead, what does that make the other one?" According to the State, it made Harris a murderer. The State downplayed Valentine's initiation of the physical confrontation, arguing this did not justify Harris's use of deadly force. Throughout its closing argument, the State repeatedly emphasized that Harris shot Valentine in the back of the head as a fact that made self-defense improbable.

The State also repeatedly emphasized the criminal context in which Harris resorted to deadly force. The State asserted that the jury ultimately did not need to know anything other than that Harris shot Valentine in the back of the head during a drug deal to find Harris guilty, arguing: "If that was all we had, if this had been a transaction just between people that fled or were left behind or we didn't have any eyewitnesses, would you have any trouble saying the person who shot Valentine in the back of the head that day was the murderer? I don't think you would."

And the State went further, arguing Harris's purported belief that deadly force was necessary was unreasonable because he was engaged in criminal activity. The State maintained that Harris's resort to deadly force was unreasonable precisely because Harris was involved in a drug deal when he shot Valentine, asserting:

[I]t is only self-defense if the person reasonably believed the force used was immediately necessary. So what makes a person reasonable[?] You might say to yourself, these guys were involved in a drug deal, there's nothing reasonable about it. They're committing crimes, they're doing wrong, they're not reasonable people to start with. So a reasonable person wouldn't find themselves in that situation.

Nor was this an isolated remark. For example, the State later asked, "We're talking about a situation where we've got individuals coming into a criminal enterprise, a criminal interaction, they both are bringing guns, so what do they expect to happen?" Still later, the State argued: "[W]e've got two people going into a situation to do a drug transaction." The State returned to this topic—the criminal nature of the whole episode—over and over again, stressing that there was "no question" Harris was "engaged in criminal activity" when he shot Valentine in the back of the head.

That is the context in which the jury posed its question. Expressing confusion about the presumption-of-reasonableness instruction, the jury asked: "[D]oes the admitted commission of a crime, sale of a controlled substance, negate the basis of a claim of self-defense?" This question went to the heart of Harris's self-defense claim, and the trial court's refusal to answer made it possible for the jury to reject Harris's claim on the basis that his own criminal activity barred self-defense, which is contrary to the law. *See Rogers*, 550 S.W.3d at 193; *Barrios*, 389 S.W.3d at 393.

Thus, the trial court's refusal to dispel the jury's confusion about whether criminal activity categorically negated self-defense was calculated to harm Harris's rights. Indeed, the trial court's refusal to answer the jury's question vitally affected

33

Harris's principal defensive theory. That is enough to satisfy the more demanding egregious-error standard that applies when a party does not timely object. *See Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016) (error is egregious if it affects very basis of case, deprives defendant of valuable right, or vitally affects defensive theory); *Reeves*, 420 S.W.3d at 816 (egregious harm is "high and difficult standard" and some harm is "less-stringent standard"). When harm is egregious, of course, there necessarily is some harm. *See Reeves*, 420 S.W.3d at 816.

In its motion for en banc reconsideration, the State argues that the trial court's refusal to answer the jury's question about self-defense, even if erroneous, did not harm Harris because the jury was also instructed on necessity and rejected it as well. The State reasons that a jury that rejects a defense of necessity necessarily would reject self-defense too, making any error in the self-defense instructions harmless.

In many cases, a jury's rejection of a necessity defense might signal that the jury likewise would have rejected self-defense in any event, making any arguable error associated with a self-defense instruction harmless. *See, e.g.*, *Barrios*, 389 S.W.3d at 395–98 (trial court erred in failing to instruct jury on defense of third person but its error was harmless because it instructed jury on defense of necessity, which jury rejected, and these defenses are very similar). But in this case? No.

The defense of necessity, like self-defense, turns on the reasonableness of a defendant's conduct under the circumstances. Under the defense of necessity, a

34

defendant's conduct is justified if, among other things, he reasonably believed his conduct was immediately necessary to avoid imminent harm. PENAL § 9.22(1); *see also Mays v. State*, 318 S.W.3d 368, 385 (Tex. Crim. App. 2010) (stating that justification defenses, like necessity and self-defense, require that defendant reasonably believe his conduct is immediately necessary to avoid greater harm).

Hence, the State's closing arguments as to how Harris's criminal conduct affected the reasonableness of his resort to self-defense applied with equal force to his necessity defense. As quoted above, the State argued that a reasonable person would not have been involved in a drug deal in the first place. According to the State, Harris was not a reasonable person precisely because he was committing a crime.

The jury's question about the presumption of reasonableness concerned the impact that the defendant's commission of a crime—specifically, the sale of prescription cough syrup—had on his claim of self-defense. Given that the jury expressed confusion about the law with respect to reasonableness in the context of self-defense, we can have little assurance that the jury was not also confused with respect to reasonableness in the context of the defense of necessity. As the State itself suggests, the reasonableness inquiry for both defenses is very much alike.

This is why, contrary to the State's argument, *Barrios* is inapposite on the issue of harm. In that case, the trial court instructed the jury on the defense of necessity but refused to instruct the jury on defense of a third person. *Barrios*, 389

S.W.3d at 392, 395–98. The court of appeals held that though the trial court had erred in refusing to instruct the jury on defense of a third person, the error was harmless because the trial court had included a necessity instruction, which required virtually the same showing of reasonableness as defense of a third person. *Id.* at 397–98. Because the jury rejected necessity, it stood to reason that the jury would have rejected defense of a third person had the trial court included this defense. *Id.*

In contrast, the trial court in this case included instructions on both self-defense and necessity. The jury was confused about the law concerning reasonableness with respect to the former defense, but the trial court refused to answer the jury's question when it asked for clarification. Because both self-defense and necessity require virtually the same showing as to reasonableness, it is likely that the jury's confusion also affected its consideration of the defense of necessity. On this record, unlike the one in *Barrios*, one cannot say the trial court's necessity instruction rendered any harm associated with the charge error merely theoretical.

Moreover, the record shows that neither the State nor the defense emphasized necessity during closing arguments. Indeed, that defense was barely mentioned in closing by either side. Self-defense, not necessity, was the overwhelming focus of the parties' closing arguments to the jury. Necessity was essentially an afterthought.

**CONCLUSION**

To fulfill its role, the jury must understand the applicable law. The record shows the jury did not understand the law on a pivotal issue: whether Harris killed Valentine in self-defense. The jury made its lack of understanding plain in its question to the trial court. But the trial court refused to answer the question, which left the jury to decide for itself what the applicable law required. Thus, we cannot have any confidence that the jury correctly understood the law when it rejected Harris's claim of self-defense and found him guilty of murder. Under these circumstances, Harris received a jury trial in form but not in substance. I respectfully dissent from the majority's judgment affirming Harris's conviction.

Gordon Goodman
Justice

Panel consisted of Chief Justice Radack and Justices Goodman and Farris.

En banc reconsideration was requested. TEX. R. APP. P. 49.7.

A majority of the justices of the court voted in favor of reconsidering the case en banc.

The en banc court consists of Chief Justice Radack and Justices Kelly, Goodman, Landau, Hightower, Countiss, Rivas-Molloy, Guerra, and Farris.

Chief Justice Radack, writing for the majority of the en banc court, joined by Justices Kelly, Landau, Hightower, Countiss, Rivas-Molloy, and Guerra.

Justice Goodman, dissenting.

Justice Farris, dissenting.

Publish. TEX. R. APP. P. 47.2(b).